# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **LAYLA D. WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 2:17-cv-00040** |
| **v.** | ) | **Chief Judge Crenshaw** |
| | ) | **Magistrate Judge Brown** |
| | ) | |
| **NANCY BERRYHILL,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

To: The Honorable Waverly D. Crenshaw, Jr., Chief United States District Judge

## REPORT AND RECOMMENDATION

Pending before the court is Plaintiff's motion for judgment on the administrative record (Docket Entry No. 12), to which Defendant Commissioner of Social Security ("Commissioner") filed a response (Docket Entry No. 14). Upon consideration of the parties' filings and the transcript of the administrative record (Docket Entry No. 10),[1] and for the reasons given herein, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment be **DENIED** and that the decision of the Commissioner be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff, Layla D. Williams, filed an application for Disability Insurance Benefits ("DIB") under Title II and an application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act on July 5, 2010, alleging disability onset as of July 1, 2010, due to degenerative disk disease with bone spurs, overweight, craniotomy, removal of Pineal gland, depression, anxiety, and bipolar disorder. (Tr. 11, 43-44, 51-52, 90-92). Plaintiff's claims were denied at the initial level

---

[1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

on December 20, 2010, and on reconsideration on April 6, 2011. (Tr. 11, 43-47, 53). Plaintiff subsequently requested *de novo* review of her case by an administrative law judge ("ALJ"). (Tr. 11, 62). The ALJ heard the case on February 9, 2012, when Plaintiff, represented by counsel, and her daughter appeared and gave testimony. (Tr. 11, 28-42). At the conclusion of the hearing, the ALJ held the record open to allow Plaintiff to submit medical records from her medical appointment scheduled for March 1, 2012 and to refer Plaintiff to undergo some consultative examinations. (Tr. 28-29, 41-42). On June 8, 2012, the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 8-20). On September 24, 2013, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (Tr. 1-5), thereby rendering that decision the final decision of the Commissioner. Plaintiff timely appealed to the United States District Court for the Middle District of Tennessee, which on May 27, 2015, remanded the action because the ALJ failed to seek testimony from a vocational expert and did not appropriately articulate a rationale for finding that Plaintiff could perform jobs that exist in significant numbers in the national economy. (Tr. 569-584).

On December 9, 2015, the Appeals Council remanded the case to the same ALJ for further evaluation. (Tr. 588-89). On May 31, 2016, the ALJ conducted a hearing where Plaintiff appeared *pro se* and gave testimony. (Tr. 522-539). At the conclusion of the hearing, the ALJ held the record open to allow Plaintiff to submit additional medical records. *Id.* On February 14, 2017, the ALJ conducted an additional hearing where Plaintiff appeared *pro se* by telephone and testified. (Tr. 541-568). Testimony was also received by a vocational expert. (Tr. 561-567). At the conclusion of the hearing, the matter was taken under advisement until May 15, 2017, when the ALJ issued a written decision finding Plaintiff not disabled. (Tr. 480-491). That decision contains the following enumerated findings:

2

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2019.

2.      The claimant has engaged in substantial gainful activity (SGA) since July 1, 2010,the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.      The claimant has the following severe impairments: depressive disorder, anxiety disorder, back disorder, seizure disorder, hypoxemia (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she can concentrate for at least 2 hours at a time; that she can deal with people and change up to one-third of the day; that she can do simple and detailed work; that she must avoid hazards; and that she cannot do highly stressful work such as production quota work.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on March 20, 1978 and was 32 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

Case 2:17-cv-00040    Document 15    Filed 05/17/18    Page 3 of 18 PageID #: 1001

11.    The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 482, 483, 485, 486, 489-90, 491).

Plaintiff did not file written exceptions to the ALJ's decision dated May 15, 2017, and the Appeals Council did not assume jurisdiction. Thus, the ALJ's May 15, 2017 decision stands as the final decision of the Commissioner. This civil action was filed in this Court, and the Court has jurisdiction. 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  REVIEW OF THE RECORD

The following summary of the medical record is taken from the ALJ's decision:

The claimant testified that she had back pain. An X-ray of her lumbar spine taken in August of 2010 showed mild narrowing of the disc space but no evidence of acute bony injury. Upon exam, the claimant had a negative straight leg raise and limited range of motion in her lumbar spine secondary to pain. An MRI of her lumbar spine taken in August of 2010 showed a mild tear of the posterior annular fibers at L5-S1 with minimal disc bulge with no evidence of nerve compromise. She was assessed with chronic lumbar degenerative disc disease. (Exhibit 6F at pp. 1-4).

In July of 2010, the claimant was admitted for intensive outpatient mental health treatment. The claimant reported recurrent depressive episodes. Treatment notes indicated that the claimant was very somatically preoccupied and was very resistant to stop taking Hydrocodone. The claimant was started on Paxil, and she benefitted from group therapy. The claimant's discharge diagnosis was mood disorder, NOS; generalized anxiety disorder; and rule/out organic mood disorder. Her global assessment of function upon discharge was 70. (Exhibit 5F at pp.9-10).

In April of 2011, Dr. Brietstein examined the claimant. The claimant was referred to Dr. Brietstein by Vocational Rehabilitation Services. The claimant reported that she quit her last job because of stress, and she stated that she wanted to attend law school. During the exam, the claimant was blunted, and she displayed little emotion. IQ testing conducted during the exam indicated that the claimant had a full scale IQ of 101. Other testing indicated that the claimant had some deficits in working memory, particularly visual working memory, as well as deficits on tasks that required divided attention and verbal fluency. Dr. Brietstein's diagnostic impression was bipolar disorder I and cognitive disorder, NOS. (Exhibit 19F).

4

Emily Rummel, M.A., consultatively examined the claimant in October of 2011. During the exam, the claimant was tearful. The claimant reported social isolation, poor appetite, insomnia, and anger outbursts. Ms. Rummel noted that the claimant had adequate short-term and long-term memory. Ms. Rummel's diagnostic impression was post-traumatic stress disorder; major depression; and obsessive-compulsive personality features. (Exhibit 20F).

In August of 2014, the claimant was treated for a concussion and cervical sprain. (Exhibits 24F, 28F at p. 6). In November of 2014, the claimant was examined for daytime sleepiness. The claimant had a sleep study in March of 2015. The claimant was assessed with sleep related hypoxemia. She was prescribed 1 liter of oxygen to use at home or at night. Her doctor also recommended that the claimant stop taking Valium and narcotic pain medication. (Exhibit 31 F). In October of 2015, the claimant sought treatment with Dr. Kabbani for abnormal EEG. The claimant was assessed with complex partial seizures. She was started on medications. (Exhibit 28F at pp. 48-49). In April of 2016, the claimant had a follow up appointment with Dr. Kabbani. The claimant requested a note stating that she could only work 8 hours per day and not the 9 to 10 hours she had been working. The claimant repotted that medications were not working for her seizures and that she has multiple seizures during the day. (Exhibit 28F).

In July of 2016, the claimant underwent a neuropsychological exam with Monica Jacobs, Psy. D. The claimant reported getting hit in the head with a key chain in 2014 and that since that time she bas had episodes of word finding difficulty and staring episodes followed by nonsensical speech. During the exam, the claimant's mood was depressed, and she was tearful. The claimant did not require repetition or clarification of instructions; she was able to maintain her attention to complete tasks; and she put forth good effort. The impression from testing was mild impairment in higher cognitive processing speed and confrontation naming. This was noted to be a non-specific finding that could be related to a number of factors such as depression, medications side effects (Ms. Jacobs noted that the claimant had taken 3 hydrocodone earlier in the day), fatigue, and/or subtle residual effects from pineal gland resection. Ms. Jacobs noted that there was no compelling evidence of concussion or post-concussive syndrome. Ms. Jacobs concluded that it was likely emotional trauma and stress that triggered the increased cognitive symptoms and the suspected seizure disorder. Ms. Jacobs concluded that the claimant had moderate to severe depression with a tendency toward somatization of emotional distress. Ms. Jacobs concluded that there was no evidence of a significant neurocognitive impairment. (Exhibit 18D at pp. l2- 16).

The claimant had a pineal gland resection in July of 2008 for a low-grade pinealcytoma. The claimant subsequently developed a central spinal fluid leak and meningitis. The claimant was treated, and she recovered. In July of 2009, treatment notes stated that the claimant was "doing beautifully" and that her most recent MRI scan looked "excellent." The claimant reported that she was working full-time and that

she had no neurologic complaints. The claimant was advised to follow up on a yearly basis. (Exhibit 2F at p. 4). In April of 2011, the claimant reported that she had made a full recovery from her surgery and meningitis. (Exhibit 19F at p. 1). Treatment notes stated that the claimant's MRI scan in 2013 showed no recurrent tumor in the pineal gland. (Exhibit 31F at p. 7). Accordingly, the undersigned finds that this is a non-severe impairment.

The record reflects that the claimant was treated for thrombocytosis. Treatment notes stated that the claimant had no neurologic symptoms. Her doctor concluded that it was likely due to a reactive etiology because her platelet count that spontaneously improved. Her doctor further concluded that there were no complications and that treatment should include intermittent CBC checks on a 4 to 6 month basis. Finally, her doctor noted that there was no disability related to this condition. (Exhibit 23F at pp. 2-3). Accordingly, the undersigned finds that this is a non- severe impairment.

The claimant had pulmonary function testing that showed a mild obstruction. (Exhibit 32F at pp. 1-8). During Dr. Uzzle's exam, the claimant had good air movement in her lungs, normal breath sounds, and no rhonchi, wheezing, or rales. (Exhibit 29F).

(Tr. 483-85).

## III. CONCLUSIONS OF LAW

### A. Standard of Review

Review of the Commissioner's disability decision is narrowly limited to determining whether the decision is supported by substantial evidence and whether the Commissioner applied the right legal standards in reaching the decision. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)). "Substantial evidence requires 'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the Commissioner's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir.

2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387 (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Buxton*, 246 F.3d at 773 (citations omitted); *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess: 'If the ALJ's decision is supported by substantial evidence, then reversal would not be warranted even if substantial evidence would support the opposite conclusion.'") (citation omitted). However, where an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller,* 811 F.3d at 833 (citation and internal quotation marks omitted).

### B. Administrative Proceedings

The claimant has the ultimate burden of establishing his entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) ("[T]he claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."). The claimant's "physical or mental

7

impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The Commissioner applies a five-step inquiry to determine whether an individual is disabled within the meaning of the Social Security Act, as described by the Sixth Circuit as follows:

> (1) a claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings; (2) a claimant who does not have a severe impairment will not be found to be disabled; (3) a finding of disability will be made without consideration of vocational factors if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four; (4) a claimant who can perform work that he has done in the past will not be found to be disabled; and (5) if a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520; 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations his impairments cause and the fact that he cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . .'" *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The Social Security Administration can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615-

8

16 (6th Cir. 2003). The grids otherwise only function as a guide to the disability determination. *Wright*, 321 F.3d at 615-16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert ("VE") testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity ("RFC") at steps four and five, the Commissioner must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. § 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. Claims of Error

#### 1. The ALJ failed to find that Plaintiff's medical condition meets or medically equals Listing 11.02.

Plaintiff asserts that she suffers from a seizure disorder and therefore her neurological impairment meets or equals Listing 11.02. (Docket Entry No. 13, at 12). Plaintiff argues that the ALJ's step three analysis is deficient because the ALJ considered only the listings for mental impairments and that any reference to Plaintiff's seizures was slightly more than a bare conclusion. *Id.* Defendant contends that the evidence in the record does not support a finding that Plaintiff met or equaled Listing 11.02. (Docket Entry No. 14, at 5).

Step three of the sequential analysis "regulates a narrow category of adjudicatory conduct . . . . Step three governs the organization of evaluation of proof of listed impairments that, if supplied, renders entitlement to benefits a foregone conclusion." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640,

649 (6th Cir. 2006) (citation omitted). "Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the [Social Security Administration's ("SSA's")] special list of impairments, or that is at least equal in severity to those listed." *Id.* at 643. "The listings," as they are commonly referred, "are descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect," and "[e]ach impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results." *Sullivan v. Zebley*, 493 U.S. 521, 529-30 (1990) (footnote omitted). The Listing of Impairments "identifies and defines impairments that are of sufficient severity as to prevent *any* gainful activity. A person with such an impairment or an equivalent, consequently, necessarily satisfies that statutory definition of disability." *Combs*, 459 F.3d at 643 (internal citations omitted and emphasis added).

A plaintiff has the burden of proving that his or her impairments meet or medically equal a listed impairment. *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 413 n.1 (6th Cir. 2011). "When a claimant alleges that he meets or equals a listed impairment, he must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Social Security Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan*, 493 U.S. at 530 (emphasis in original). Similarly, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Id.* at 531 (emphasis in original). The Commissioner "has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard" because "for adults, the listings

10

were designed to operate as a presumption of disability that makes further inquiry unnecessary." *Id*. at 532.

The Sixth Circuit has rejected a heightened articulation standard, noting that an ALJ is not required to spell out "every consideration that went into the step three determination" or "the weight" given each factor in the ALJ's step three analysis or to recount every fact discussed elsewhere in the opinion. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006); *Gower v. Comm'r of Soc. Sec.*, No. 13-14511, 2015 WL 163830, at *26 (E.D. Mich. Jan. 13, 2015). "A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he has satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014). Instead, "the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing. . . . Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id*. at 432-33 (citations and footnote omitted).

To meet Listing 11.02, Plaintiff cites the following:

11.02 Epilepsy, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

A. Generalized tonic-clonic seizures (see 11.00H1a), occurring at least once a month for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or

B. Dyscognitive seizures (see 11.00H1b), occurring at least once a week for at least 3 consecutive months (see 11.00H4) despite adherence to prescribed treatment (see 11.00C); or . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.02 (2017).

However, Plaintiff's reliance on this listing is in error. The ALJ noted that in July 2016 Plaintiff underwent a neuropsychological examination with Monica Jacobs, Psy. D., who concluded

11

that emotional trauma and stress likely triggered Plaintiff's increased cognitive symptoms and suspected the suspected seizure disorder. (Tr. 484; 735-40). Jacobs concluded that Plaintiff had moderate to severe depression with a tendency toward somatization of emotional distress and that there was no evidence of a significant neurocognitive impairment. (Tr. 484). The ALJ also noted that Plaintiff testified at the February 14, 2017 hearing that her seizures were psychogenic (Psychogenic non-epileptic seizures (PNES)) in nature. (Tr. 487, 545, 555, 560, 739). The regulations provide that "psychogenic nonepileptic seizures and pseudoseizures are not epileptic seizures for the purpose of 11.02," and that they are evaluated "under the mental disorders body system, 12.00." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00(H)(1) (2017). Thus, based upon the regulations, the ALJ appropriately applied the listings under 12.00. *Coleman v. Astrue*, No. 3:05-0389, 2010 WL 28567, at *11-13 (M.D. Tenn. Jan.5, 2010) (because the plaintiff was diagnosed with psychogenic seizures or pseudoseizures the ALJ was precluded from applying Listings 11.02 and 11.03 as those listings dealt with disability requirements specific to convulsive and nonconvulsive epilepsy). The ALJ concluded that the severity of Plaintiff's mental impairment did not meet or medically equal the criteria of Listings 12.04 and 12.06. (Tr. 485-86). Plaintiff does not contest the ALJ's findings as to Listings 12.04 and 12.06.

Further, in support for meeting Listing 11.02, Plaintiff cites to Dr. Kabbani's treatment notes from October 2015 to April 2016. (Docket Entry No. 13, at 12; Tr. 850-55). However, at step one, the ALJ determined that Plaintiff had substantial gainful activity ("SGA") from 2011 through April 2016. (Tr. 483, 487). Plaintiff does not dispute the ALJ's step one determination. "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan*, 493 U.S. at 532 (emphasis in original). Thus, Plaintiff's argument is refuted by Plaintiff's ability to perform gainful

12

activity.  Also, in April 2016, Plaintiff sought a note from Dr. Kabbani stating that she could work eight hours a day and not the nine to ten hours that she had been working.  (Tr. 484).  Plaintiff does not cite to any medical evidence after April 2016 in support of her contention that she met a listing under 11.02.  Accordingly, Plaintiff's argument is without merit.

### 2.  The ALJ failed to provide good reasons for rejecting the opinion of Dr. Rodney McMillin, Plaintiff's treating physician.

Plaintiff argues that the ALJ failed to consider the August 2011 mental evaluation of Dr. Rodney McMillin, Plaintiff's treating physician, who described Plaintiff as "catatonic" and "lethargic."  (Docket Entry No. 13, at 10-11; Tr. 452).  Plaintiff argues that Plaintiff's functional limitations are severe and "actually prevent her from working," and Dr. McMillin's opinion has been corroborated by other mental health professionals and is not patently deficient.  *Id*. at 11.

"A treating physician's opinion is normally entitled to substantial deference, but the ALJ is not bound by that opinion.  The treating physician's opinion must be supported by sufficient medical data."  *Jones*, 336 F.3d at 474 (citation omitted).  Thus, "[t]reating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citation omitted).  "If the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for her rejection."  *Jones*, 336 F.3d at 477.  The regulations provide that an ALJ must provide "good reasons" for discounting the weight of a treating source opinion.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  "Those good reasons must be 'supported by the evidence in the  case record, and must be sufficiently specific to make clear to any subsequent

13

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Blakley*, 581 F.3d at 406-07 (citation omitted). If the ALJ does not accord the treating physician's opinion "controlling weight," then the ALJ must weigh the opinion based on a number of factors, including: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Id*. at 406. However, "[t]he ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017).

Failure to comply with the "good reasons" requirement, however, may be deemed harmless error. *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011). "If an ALJ rejects a treating physician's opinion but gives no reasons for doing so, it is difficult for a reviewing court to conduct its own analysis and make a judgment as to what the ALJ's reasons would have been-unless . . . the treating physician's opinion is 'so patently deficient that the Commissioner could not possibly credit it.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 657 (6th Cir. 2009)) (quoting *Wilson*, 378 F.3d at 547); *Watters v. Comm'r of Soc. Sec. Admin.*, 530 F. App'x 419, 423 (6th Cir. 2013).

In August 2011, Dr. McMillin opined that Plaintiff was unable to meet competitive standards for performing at a consistent pace, accepting instructions and responding appropriately to criticism from supervisors, and dealing with normal work stress. (Tr. 454). Dr. McMillin also opined that Plaintiff had serious limitations in completing a normal workday and workweek without interruptions from psychologically based symptoms. *Id.* Although the ALJ did not specifically discuss Dr. McMillin's August 2011 opinion in the ALJ's May 15, 2017 decision, the ALJ gave the opinion

14

minimal weight in the prior decision because Dr. McMillin was not a psychologist or psychiatrist and the opinion was therefore outside of Dr. McMillin's expertise. (Tr. 16). *See* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5). Also, in the ALJ's May 15, 2017 decision, the ALJ noted that Plaintiff did not have formal mental health treatment, but she had been treated by her primary care physicians with various medications. (Tr. 487). Significantly, the ALJ further noted that, while there was evidence that Plaintiff had mental impairments, Plaintiff engaged in substantial gainful activity from 2011 through April 2016, and thus, concluded that Plaintiff's impairments were not as severe as she alleged. (Tr. 487). Plaintiff does not dispute the ALJ's SGA determination.

Plaintiff also asserts that Dr. McMillin's August 2011 opinion is corroborated by various other providers, but does not provide any real analysis. The record reflects that the ALJ noted that Dr. Briestein's examination in April 2011 showed Plaintiff's I.Q. as 101. (Tr. 439, 484). In 2016, Jacobs noted Plaintiff's I.Q. as 114. (Tr. 738). The ALJ noted that in July 2010 Plaintiff was admitted for intensive outpatient mental health treatment, she was started on Paxil, and she benefitted from group therapy. (Tr. 483, 336). Plaintiff's discharge diagnosis was mood disorder, not otherwise specified ("NOS"); generalized anxiety disorder; and rule out organic mood disorder. *Id.* The ALJ also noted that Emily Rummel, M.A., consultatively examined Plaintiff in 2011 and completed a medical source statement. (Tr. 442-51, 484, 488). In giving little weight to Rummel, the ALJ explained:

> Ms. Rummel concluded that the claimant had a limited but satisfactory ability to interact with the public and maintain socially appropriate behavior but on the next page of the opinion, Ms. Rummel indicated that the claimant had marked limits in social interaction. Ms. Rummel also indicated that the claimant had moderate limits in activities of daily living and concentration and that the claimant would miss up to 4 days a month. The undersigned finds that Ms. Rummel's opinion is internally inconsistent and that Ms. Rummel examined the claimant in 2011. Therefore, Ms. Rummel did not have access to the complete medical evidence of record. Furthermore, the claimant earned SGA in 2011.

(Tr. 449-451, 488-89).

15

In giving little weight to Dr. Allred, who consultatively examined Plaintiff in July 2016, the

ALJ stated:

> During the mental status exam, the claimant recalled 2 out of 3 items after a brief delay; she completed serial sevens; she spelled <u>world</u> backward; and she completed simple calculations. Dr. Allred noted that the claimant had good judgment, limited insight, and adequate fund of knowledge. As for her activities of daily living, the claimant stated that she could cook, clean, and shop but that she was sometimes limited due to medical complications. Dr. Allred's diagnostic impression was bipolar disorder (by history); unspecified anxiety disorder; unspecified neurocognitive disorder (by history); and rule out PTSD. Dr. Allred concluded that the claimant's understanding and remembering was difficult to ascertain; that the claimant had moderate to marked limits in concentration, social interaction, and adaptation. (Exhibit 30F). The undersigned notes that Dr. Allred based her limitations on "features of bipolar disorder, symptoms of anxiety as well as a history of cognitive disorder with possible PTSD." The undersigned finds that Dr. Allred's conclusion that the claimant had potentially marked mental limitations is overly restrictive when compared to the other evidence of record. For instance, the claimant performed well during Dr. Allred's mental status exam. The claimant also reported that she got along with others. In addition, Ms. Jacobs noted that the claimant did not have evidence of a neurocognitive disorder and that she displayed only mild impairment in higher cognitive processing speed and confrontation naming. Furthermore, the undersigned notes that the claimant was able to work and earn substantial gainful activity every year since her alleged onset date. Therefore, the undersigned gives little weight to Dr. Allred's conclusion that the claimant had potentially marked mental limitations.

(Tr. 488, 898-902).

As to Jacobs's opinion, the ALJ stated the following:

> As previously discussed, Ms. Jacobs examined the claimant in July of 20 16. (Exhibit 18D). Based on the exam, Ms. Jacobs concluded that the claimant was not capable of competitive paid employment due to her psychiatric symptoms of depression, anxiety, possible seizure disorder, and general malaise. The undersigned notes that Ms. Jacobs examined the claimant on only one occasion. In addition, Ms. Jacobs noted that the claimant did not need clarification or repetitive instructions during the exam, and the claimant maintained attention in completing all tasks. Ms. Jacobs further noted that the claimant exhibited only mild impairment in higher cognitive processing speed and confrontation naming. Accordingly, the undersigned gives Ms. Jacobs's opinion that the claimant could not maintain competitive employment little weight.

(Tr. 489, 738-39).

Plaintiff also argues that the ALJ "also failed to mention or consider the opinion of Dr. Thakur." (Docket Entry No. 13, at 11). However, Plaintiff does not provide the significance of Dr. Thankur's opinion or any analysis pertaining to this opinion.[2] A court is not obligated on judicial review to formulate arguments on a plaintiff's behalf. *Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006). "'It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" *Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 543 (6th Cir. 2014) (citing *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) (citation omitted)). "'Issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" *Id.* (citing *Stewart*, 628 F.3d at 256 (citation omitted)). Consequently, this argument is waived.

Accordingly, based upon the above, the Magistrate Judge concludes that the ALJ's failure to specifically mention Dr. McMillin's August 2011 opinion was harmless error as the record shows that Dr. McMillin's August 2011 opinion was so patently deficient that the Commissioner could not possibly credit it. *Rabbers*, 582 F.3d at 657.

## IV. CONCLUSION AND RECOMMENDATION

For the reasons explained above, the Magistrate Judge **RECOMMENDS** that Plaintiff's motion for judgment on the administrative record (Docket Entry No. 12) be **DENIED**, and the

---

[2]The Magistrate Judge notes that Plaintiff does not assert that Dr. Thakur qualified as a treating physician, nor does the record demonstrate that Dr. Thakur acted in such capacity. Opinions by consulting or non-treating doctors need not be evaluated in accordance with the treating physician rules outlined by the Sixth Circuit. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 729-30 (6th Cir. 2013); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("[T]he SSA requires ALJs to give reasons for only *treating* sources.") (emphasis in original). Dr. Thakur's opinion is only in a checkmark form that does not cite to any objective evidence in support. (Tr. 712). The opinion only indicates that Dr. Thakur examined Plaintiff twice (Tr. 711). *See Rudd*, 531 F. App'x at 729 (doctor who examined plaintiff four times in two years was not a treating physician).

17

Commissioner's decision be **AFFIRMED**.  The parties have fourteen (14) days of being served with a copy of this Report and Recommendation to serve and file written objections to the findings and recommendation proposed herein.  A party shall respond to the objecting party's objections to this Report and Recommendation within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation may constitute a waiver of further appeal.  *Thomas v. Arn*, 474 U.S. 140, 142, *reh'g denied*, 474 U.S. 111 (1986); *see Alspaugh v. McConnell*, 643 F.3d 162, 166 (6th Cir. 2011).

 **ENTERED** this 17th day of May, 2018.

    /s/  Joe  B.  Brown     

    JOE B. BROWN
    United States Magistrate Judge